1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  In re:                              Case No.: 2:12-cv-03068 JAM-EFB

12  INTELLIGENT DIRECT MARKETING,       Related No.: 2:09-cv-02898 JAM-
                                        GGH
13                Debtor,
                                        [Bky Case 07-30685-A-7]
14  THOMAS ACEITUNO, Chapter 7
    Trustee,                            [Bky AP No. 09-2439]
15
                      Plaintiff,
16
                                        **FINDINGS OF FACT AND CONCLUSIONS
17       v.                             OF LAW AS TO PLAINTIFF'S CLAIMS
                                        AGAINST TODD AND RAEANNE VOWELL,
18  TODD VOWELL; RAEANNE VOWELL;        JEFFREY GARCIA, AND FIDELIS
    BEVERLY VOWELL; STEADFAST           MARKETING INC.**
19  MAILING SERVICES, INC.; SASHI
    CORPORATION; JEFFREY K.
20  GARCIA; and FIDELIS
    MARKETING, INC.,
21
22                  Defendants.

23       In this action, Plaintiff Thomas Aceituno's, Chapter 7

24  Trustee, ("Plaintiff" or "Trustee") seeks to avoid and recover

25  fraudulent transfers; to recover corporate distributions; to

26  recover damages for breach of fiduciary duty; to recover

27  preferential payments; to recover damages for conversion of

28

                                  1

1   assets and conspiracy; and a declaratory judgment for successor

2   liability (Doc. #9 in the Bankruptcy Adversary Proceeding).

3       Beginning on June 23, 2014, and through June 27, 2014, the

4   Court held a bench trial and heard testimony from Todd Vowell,

5   Lawerence Lemus, Jeff Garcia, Stuart Robken, and Raenne Vowell.

6   Numerous exhibits were also submitted by the parties for the

7   Court's consideration.  Following the bench trial, the Trustee

8   submitted a post-trial supplemental brief (Doc. #75) and all

9   parties submitted proposed findings of fact and conclusions of

10  law (Doc. ##73, 74, 76).  For the reasons set forth below and

11  upon review of the FAC, undisputed facts, testimony, exhibits,

12  briefing, and all arguments made, the Court now enters its

13  Findings of Fact and Conclusions of Law pursuant to Federal Rule

14  of Civil Procedure 52(a).

15

16                  I.   FINDINGS OF FACT

17      1.   The remaining parties in this lawsuit are as follows:

18  the Trustee for Intelligent Direct Marketing, Inc. ("IDM"),

19  Defendants Todd Vowell ("Mr. Vowell"), Raeanne Vowell ("Ms.

20  Vowell"), Jeff Garcia ("Mr. Garcia"), and Fidelis Marketing, Inc.

21  ("Fidelis").  Defendant Beverly Vowell is deceased and all claims

22  against her are dismissed.  Defendant Sashi is a corporation and

23  all claims against it are dismissed.  Defendant Steadfast Mailing

24  Services, Inc. ("Steadfast") is a suspended corporation not

25  represented by counsel.  Undisputed Facts ("UF"), Amended

26  Pretrial Conference Order, Doc. #44, ¶ 1.

27  ///

28  ///

2.   Todd Vowell began operating as an automotive direct mailing service in approximately 1994 and incorporated IDM in 1997 as an "S" corporation.  He is and at all times mentioned herein was the sole shareholder, sole director, and CEO of IDM. Id. ¶ 2.

3.   On April 24, 2001, Mr. Vowell caused Sashi to be incorporated.  The shareholders, officers, and directors of Sashi were the Vowells.  Id. ¶ 3.

4.   In or about 2001, Sashi purchased real property known as 6930 Destiny Drive, Rocklin, CA 95677 ("Destiny Drive"). Sashi leased Destiny Drive to IDM under a lease that expired in August 2005.  Id. ¶ 4.

5.   On or about December 30, 2004, Sashi purchased 5750 West Oaks Blvd., Rocklin, CA ("West Oaks" Property).  This is a commercial building with a total of 54,960 square feet.  Id. ¶ 5.

6.   IDM transferred $1,779,039 directly to the escrow account to buy the West Oaks Property.  IDM's Bank Statement, Ex. 1, 2, and 3; Settlement Statement Regarding West Oaks property, Ex. 41; Mr. Vowell's Testimony.

7.   Mr. Vowell loaned money to Sashi in 2005 to purchase the West Oaks Property.  Sashi leased a portion of the West Oaks Property to IDM.  IDM paid Sashi rent in 2005.  UF ¶ 6.

8.   In or about December 2004, IDM moved from Destiny Drive to the West Oaks Property.  IDM entered into a written lease with Sashi dated January 1, 2005, for 5 years for 27,200 square feet, or approximately 50% of the building.  The space that IDM moved into had not been occupied previously.  Id. ¶ 7.

3

9.   IDM paid for the improvements of the West Oaks Property.  IDM's 2004 Tax Return, Ex. 62.

10.  IDM could not afford the West Oaks Property lease.  Mr. Garcia's Testimony; Mr. Vowell Email Dated January 21, 2007, Ex. 104.

11.  At the end of 2004, IDM was depleted of all its cash. IDM's Bank Statement, Ex. 1, 2, and 3.

12.  In 2004, IDM had gross revenues of over $26 Million. UF ¶ 8.

13.  When Sashi sold West Oaks in June 2005, it used the approximately $3 million in sale proceeds it received in part to pay $1,576,929 to Mr. Vowell and "loan" funds to IDM of $900,000. Id. ¶ 9.

14.  On July 28, 2005, $2,650,000 was deposited into Mr. Vowell's bank account from the sale of the West Oaks Property. Mr. Vowell's Bank Statement, Ex. 89.

15.  On July 20, 2004, IDM entered into a one-year lease of 19,144 square feet of rentable space located within Building 347, "B" Bay 4937 43rd Ave., McClellan CA 95652 ("McClellan Property").  UF ¶ 10.

16.  In 2005, IDM had gross revenues over $21 Million.  Mr. Vowell received $633,620.50 in wages and compensation.  Mrs. Vowell received $45,200 in wages (not including contributions to 401k plans).  Id. ¶ 11.

17.  In 2005, IDM's total assets at the end of the year were $3,329,020 and the total liabilities were $2,788,937. IDM's 2005 Tax Return, Ex. 63.

4

18.  In 2006, Mr. Vowell received wages of $242,000.00 from IDM (not including 401k contributions).  In 2006, Mrs. Vowell did not receive any wages from IDM.  Id. ¶ 12.

19.  In 2006, the Vowells transferred $575,000 to IDM. Vowells' Checks to IDM, Ex. B1, B2, and B3.

20.  In 2007, Mr. Vowell received wages from IDM of $21,250.00.  Mrs. Vowell did not receive any wages. UF ¶ 13.

21.  By late 2006 and 2007, IDM was operating at a loss. Id. ¶ 14.

22.  On or about April 30, 2007, IDM ceased sale operations or performing its contracts, and vacated the West Oaks Property. Id. ¶ 15.

23.  On October 14, 2007, Mr. Vowell received a $454,299 tax refund as a result of IDM's 2006 losses being carried back to offset IDM's 2004 income. IDM's 2006 tax return, Ex. 64; Application for a Tax Refund, Ex. 100.

24.  On February 22, 2011, Mr. Vowell received a $301,879 tax refund as a result of IDM's losses being carried back to offset IDM's 2005 income.  Mr. Vowell Bank Statement, Ex. 91, at T-7-293; Changes to IDM's 2005 Tax Return, Ex. 94.

25.  The $454,299 tax refund was used to pay IDM's expenses. Mr. Vowell's Testimony.

26.  On May 1, 2007, Mr. Garcia started Fidelis, a direct mail marketing company.  Mr. Vowell's testimony; Mr. Garcia's Testimony.

27.  There were no differences between Fidelis and IDM except for the debt.  Mr. Vowell's testimony.

28. Mr. Vowell paid almost all of Fidelis' startup costs. Mr. Vowell's Testimony.

29. Starting on May 1, 2007, Fidelis began performing contracts with customers, including contracts with customers that were former IDM customers. UF ¶ 16.

30. IDM granted Fidelis a right to possess IDM's goodwill, income stream, and assets. Mr. Garcia Email dated March 20, 2007, Ex. 32, at 2; Mr. Vowell Email dated March 26, 2007, Ex. 110, at 1; Mr. Vowell Email Dated May 4, 2007, Ex. 108.

31. The transfer of assets was to prevent creditors from collecting IDM's debts. See Garcia Email Dated March 20, 2007, Ex. 32, at 2. Garcia Email, Ex. 110, at 2.

32. Mr. Vowell prepared letters to notify creditors but the letters were never sent. Mr. Vowell's Testimony.

33. By mid-July 2007, Mr. Garcia/Fidelis and Vowells/Steadfast had reached an impasse and would not reach an agreement, or Fidelis/Garcia breached an agreement, regarding Fidelis' exclusive use of Steadfast for printing, or Fidelis' payment to Mr. Vowell of a consulting fee, or lease payments. At that point, Fidelis moved out of Steadfast's Melody Lane facility. UF ¶ 17.

34. Fidelis operated successfully in 2007 and was profitable. Monthly deposits into Fidelis' account in 2007 were as follows: May $883,307.55; June $1,161,518.87; July $720,109; August: $945,059.11; September $847,218.74; October $848,142.83; November $754,835.35; December $608,986.81. From income in 2007, Fidelis set aside $400,000 after payment of expenses. Id. ¶ 18. ///

35.  On July 26, 2007, Mr. Vowell, Steadfast, and IDM, filed a lawsuit against Mr. Garcia, Tony D. Tran, and Fidelis for misappropriation of trade secrets, conversion, breach of contract and other claims, (Placer County Superior Court Case No. S CV 214314).  On September 11, 2007, Defendants filed a Cross-Complaint against Plaintiffs, and on December 24, 2007, filed a First Amended Cross-Complaint, alleging intentional interference with contractual relations, conversion, alter ego, wage claims, and other claims.  Id. ¶ 19.

36.  On or about April 24, 2008, the United States Bankruptcy Court, Eastern District of California, made an oral ruling granting an order for relief in the state court action. On June 18, 2008, the United States Bankruptcy Court, Eastern District of California, issued its written Findings of Fact and Conclusions of Law.  On August 18, 2008, Fidelis and other defendants removed the state court action to the bankruptcy court (Adv. Proc. No. 08-2456), which was later stayed pending the outcome of this proceeding.  Id. ¶ 20.


II.  OPINION

The Trustee brought this action against Defendants alleging the following causes of actions: (1) avoidance and recovery of fraudulent transfers, 11 U.S.C. §§ 548, 544; California Civil Code sections 3439.04, 3439.05, against Mr. Vowell; (2) recovery of corporate distributions, California Corporation Code section 500, against Mr. Vowell; (3) breach of fiduciary duty against Mr. Vowell; (4) avoidance and recovery of fraudulent transfers against Mrs. Vowell; (5) avoidance and recovery of fraudulent

7

transfers against Beverly Vowell; (6) avoidance and recovery of
fraudulent transfers against Steadfast and Mr. Vowell;
(7) avoidance and recovery of preferential payments against
Steadfast and Mr. Vowell; (8) conversion and conspiracy to
convert assets against Mr. Vowell, Mrs. Vowell, Steadfast,
Fidelis, and Mr. Garcia; (9) avoidance and recovery of fraudulent
transfers against Mr. Vowell, Mrs. Vowell, Steadfast, Fidelis,
and Mr. Garcia; and (10) successor liability against Fidelis and
Mr. Garcia.

       According to the First Amended Complaint ("FAC"), the first
two causes of actions are based on the following transfers: (1)
the $1.6 million transfer from IDM to Mr. Vowell (FAC ¶¶ 18, 36);
(2) Mr. Vowell's 2005 compensation (FAC ¶¶ 19,36); (3) Mr.
Vowell's 2006 compensation ("2006 compensation")(FAC ¶¶ 19,36);
(4) $350,000 promissory note from Mr. Vowell to IDM ("promissory
note")(FAC ¶¶ 20, 36);
(5) $750,000 in advances made from IDM to officers
("advances")(FAC ¶¶ 20, 36); (6) the compensation paid by IDM to
Mrs. Vowell and Beverly Vowell during the period of 2005 through
2008; (7) Mrs. Vowell's American Express charges (FAC ¶¶ 23, 36);
and (8) property of IDM retained by Mr. Vowell and not turned
over to the Trustee.

       As mentioned above, all claims against Beverly Vowell and
Sashi have been dismissed.  During the bench trial, the Court
granted in part and denied in part the Vowell's motion for
judgment on partial findings.  Pursuant to Federal Rule of Civil
Procedure 52(c), the Court dismissed the claims based on the
promissory note, advances, 2006 compensation, the fourth cause of

1   action, and the seventh cause of action as to any other amount

2   not in evidence.   Further, in the Trustee's proposed findings of

3   fact and conclusions of law, he proposes that there was

4   insufficient basis for recovery of the 2005 compensation.   See

5   The Trustee's Proposed Findings of Fact and Conclusions of Law

6   ("Trustee's Proposed F&C"), Doc. 74, ¶ 54.

7        In the Trustee's supplemental post-trial brief, he moves to

8   amend the pleadings to conform them to the evidence and to raise

9   unpleaded issues pursuant to Federal Rule of Civil Procedure

10  15(b)(2) ("Rule 15(b)(2)").   Trustee's Supp. Post-Trial Brief

11  ("Trustee's Supp. PTB"), Doc. #75, at 1-2.   In particular, the

12  Trustee wants to include claims based on the tax refunds Mr.

13  Vowell received in 2007 and 2011.   Under Rule 15(b)(2), "When an

14  issue not raised by the pleadings is tried by the parties'

15  express or implied consent, it must be treated in all respects as

16  if raised in the pleadings."   Fed. R. Civ. P. 15(b)(2).   In this

17  case, the tax refunds were included in the Amended Pretrial

18  Conference Order and were tried without objection during the

19  bench trial.   Moreover, in the FAC, the Trustee mentions that Mr.

20  Vowell received substantial tax refunds as a result of the tax

21  returns filed by IDM and he requests "for such other and further

22  relief as the Court deems appropriate."   FAC ¶ 25; FAC Prayer for

23  Relief ¶ 7.   Accordingly, the Court need not grant the motion to

24  amend the pleadings because the allegations are in the FAC.

25       In addition, the Court holds that all the claims not

26  discussed in either the Trustee's proposed findings of fact and

27  conclusions of law or the Trustee's supplemental post-trial brief

28  are abandoned.   Therefore, the remaining claims in this case are

1   as follows: (1) avoidance and recovery of the $2,650,000 paid to
2   Mr. Vowell on July 28, 2005, from the West Oaks Property as a
3   fraudulent transfer under 11 U.S.C. §§ 548, 544 and California
4   Civil Code sections 3439.04, 3439.05; (2) recovery of the
5   $2,650,000 corporate distribution under California Corporation
6   Code section 500; (3) breach of fiduciary duty based on the
7   $2,650,000 transfer; (4) unjust enrichment of the $454,299 tax
8   refund paid to Mr. Vowell on October 17, 2007, and the $301,879
9   tax refund paid to Mr. Vowell on February 22, 2011; (5)
10  conversion and conspiracy to convert assets against Mr. Vowell,
11  Steadfast, Fidelis, and Mr. Garcia; (6) avoidance and recovery of
12  fraudulent transfers against Mr. Vowell, Fidelis, and Mr. Garcia;
13  and (7) successor liability against Fidelis and Mr. Garcia.[1]

14      A.    $2,650,000 Fraudulent Transfer

15      The Trustee's fraudulent transfer claims arise under federal
16  bankruptcy law, 11 U.S.C. §§ 548, 544, as well as state law,
17  California Civil Code sections 3439.04, 3439.05.  Section 544(b)
18  of the Bankruptcy Code permits the Trustee to stand in the shoes
19  of a creditor to assert any state law claims that a creditor may
20  have.

21      Under the Bankruptcy Code and California law, there are two
22  types of fraudulent conveyances: actual and constructive.
23  Compare 11 U.S.C. § 548(a)(1)(A); Cal. Civ. Code § 3439.04(a)(1)
24  with 11 U.S.C. § 548(b); Cal. Civ. Code §§ 3439.04(a)(2),
25  3439.05.  An actual fraudulent transfer is one made with "actual
26

27  [1] The Trustee has also moved for judgment against Steadfast and
    Mr. Vowell (Doc. #77), which the Court addresses in a separate
28  order.

1  intent to hinder, delay, or defraud a creditor."  <u>See</u> 11 U.S.C. §

2  548(a)(1)(A); Cal. Civ. Code § 3439.04(a)(1).  A constructive

3  fraudulent transfer does not require an intent to defraud.  <u>See</u>

4  11 U.S.C. § 548(b); Cal. Civ. Code §§ 3439.04(a)(2), 3439.05.

5  This claim involves a constructive fraudulent conveyance because

6  no evidence of an intent to defraud was produced.

7              1.   <u>The Bankruptcy Code</u>

8       To prove a claim for constructive fraudulent conveyance

9  under 11 U.S.C. § 548(a)(1)(B), a plaintiff must show that

10  (1) the transfer involved property of the debtor; (2) the

11  transfer was made within two years of the filing of the

12  bankruptcy petition; (3) the debtor did not receive reasonably

13  equivalent value in exchange for the property transferred; and

14  (4)(a) the debtor was insolvent at the time of the transfer or

15  was made insolvent by the transfer or (b) the transfer was to an

16  insider under an employment contract and not in the ordinary

17  course of business.  11 U.S.C. § 548(a)(1)(B); <u>see also</u> <u>In re</u>

18  <u>United Energy Corp.</u>, 944 F.2d 589, 594 (9th Cir. 1991) (stating

19  elements of a claim for fraudulent transfer under § 548).

20       The $2,650,000 transfer occurred on July 28, 2005.  The

21  involuntary bankruptcy petition was filed on December 10, 2007.

22  Therefore, the Trustee's claim to void and recover the $2,650,000

23  fails under § 548 because it was not made within two years of the

24  filing of the bankruptcy petition.

25              2.   <u>California Law</u>

26       Under California law, a transfer is constructively

27  fraudulent if the debtor made the transfer without receiving

28  reasonably equivalent value in exchange and the debtor did one of

11

1   the following:

2          (1) was engaged or about to engage in a business or
           transaction for which the debtor's remaining assets
3          were unreasonably small in relation to the business or
           transaction; or (2) intended to incur or believed (or
4          reasonably should have believed) that it would incur
           debts beyond its ability to repay; or (3) was insolvent
5          at the time, or was rendered insolvent by the transfer
           or obligation.

6

7   United States v. Whitman, 2:12-CV-2316-MCE-EFB, 2013 WL 3968083,

8   at *7 (E.D. Cal. July 31, 2013) report and recommendation

9   adopted, 2:12-CV-2316-MCE-EFB, 2013 WL 4516009 (E.D. Cal. Aug.

10  26, 2013).  Unlike the Bankruptcy Code, the statute of

11  limitations under California law for constructive fraudulent

12  conveyances is four years.  Cal. Civ. Code § 3439.09(a).

13         Based on Schedule L, Balance Sheets, of IDM's 2005 tax

14  return, IDM's total assets at the end of the year were $3,329,020

15  and the total liabilities were $2,788,937.  The Trustee argues

16  that in 2005, IDM was already experiencing financial stress.

17  However, there is insufficient evidence to show that IDM was

18  insolvent, its remaining assets were unreasonably small in

19  relation to the 2.65 million dollar transfer, or the debtor

20  intended to incur or believed (or reasonably should have

21  believed) that it would incur debts beyond its ability to repay.

22  Accordingly, the Court holds that the Trustee's claim to void and

23  recover the $2,650,000 as a fraudulent transfer under California

24  law fails.

25         B.   $2,650,000 Distribution

26         The Trustee seeks to recover the $2,650,000 transfer as an

27  improper distribution under California Corporation Code section

28  500 ("Section 500").  The Vowells argue that the $2,650,000

1  transfer should not be treated as an IDM distribution because

2  Sashi owned the property not IDM.  In his supplemental brief, the

3  Trustee argues Sashi should be treated as the alter ego of IDM.

4      As a threshold matter, the Court must determine whether the

5  alter ego doctrine applies.  Alter ego applies when "(1) there is

6  such a unity of interest and ownership between the corporation

7  and the individual or organization controlling it that their

8  separate personalities no longer exist, and (2) failure to

9  disregard the corporate entity would sanction a fraud or promote

10  injustice."  Communist Party v. 522 Valencia, Inc., 35

11  Cal.App.4th 980, 993 (1995).  First, there is a unity of interest

12  and ownership in this case because Sashi held the title to the

13  West Oaks Property but IDM purchased it under Sashi's name by

14  directly transferring $1,779,039 into the escrow for the

15  property, prepaying rent, and paying for tenant improvements.

16  Second, failure to disregard the corporate entity would promote

17  injustice because IDM was depleted of all cash to purchase and

18  improve the West Oaks Property, which was sold and resulted in a

19  $2,650,000 payment to the Vowells not IDM.  Based on these facts,

20  the Court finds Sashi is the alter ego of IDM.

21      The Court must determine whether the distribution was

22  proper.  A corporation is barred from making any distribution

23  unless it meets the requirements of Section 500.  Cal. Corp. Code

24  § 500.  The previous version of Section 500, which applies in

25  this case, prohibits a distribution unless (a) before the

26  distribution, the corporation's retained earnings exceed the

27  distribution, or (b) the assets after the distribution are at

28  least 125% of the liabilities and the current assets are at least

13

1  equal to the current liabilities.  Id. (prior to the 2012

2  amendment).  "Distribution" is defined in California Corporations

3  Code section 166 as "the transfer of cash or property by a

4  corporation to its shareholders without consideration, whether by

5  way of dividend or otherwise . . . ."  Cal. Corp. Code § 166.

6      On this issue, the Trustee's expert testified that the

7  distribution was improper because the transfer exceeded IDM's

8  retained earnings by $490,893 and IDM's assets did not exceed

9  125% of its liabilities.  The Court finds this part of the

10  expert's testimony credible and the Vowells provided no evidence

11  to the contrary.  At most, the Vowells submitted three checks to

12  show that they transferred a total of $575,000 to IDM in 2006.

13  However, returning the money to IDM after the $2,650,000

14  distribution does not make the distribution appropriate.

15      Accordingly, the Court holds that the $2,650,000

16  distribution was improper, but the Vowells are entitled to a

17  $575,000 offset against the distribution for the money that was

18  returned to IDM.  The Vowells also returned money in 2008 but the

19  Court will not credit this amount because it was approximately 3

20  years after the distribution.

21      C.   Breach of Fiduciary Duty

22      The Trustee claims that Mr. Vowell breached his fiduciary

23  duty to IDM by causing IDM to make distributions to him.

24      The elements of a claim for breach of fiduciary duty are

25  "(1) the existence of a fiduciary relationship; (2) the breach of

26  that relationship; and (3) damages proximately caused by the

27  breach."  In re GSM Wireless, Inc., 2:12-BK-16456 RK, 2013 WL

28  4017123 , at *41 (Bankr. C.D. Cal. Apr. 5, 2013) (citing Pierce

14

1   v. Lyman, 1 Cal.App.4th 1093, 1101 (1991)).  "Remedies for a

2   breach of fiduciary duty include damages for all harm proximately

3   caused to the corporation, as well as rescission and

4   restitution."  Id. (citing Hicks v. Clayton, 67 Cal.App.3d 251,

5   264 (1977) (citations omitted)).  "A director's fiduciary duty at

6   common law—generally, to act with honesty, loyalty, and good

7   faith—predated the statute by decades."  Lehman v. Superior

8   Court, 145 Cal.App.4th 109, 121 (2006).  Similarly, under

9   California Corporation Code section 309, a director shall perform

10  his duties as a director "in good faith, in a manner such

11  director believes to be in the best interest of the corporation

12  and its shareholders and with such care, including reasonable

13  injury, as an ordinarily prudent person in a like position would

14  use under similar circumstances."  Cal. Corp. Code § 309.

15      A director is protected by the business judgment rule, which

16  provides that "a director shall be entitled to rely on

17  information, opinions, reports or statements [prepared by

18  specific parties including independent accountants] . . . so long

19  as . . . the director acts in good faith, after reasonable

20  inquiry when the need therefor is indicated by the circumstances

21  and without knowledge that would cause such reliance to be

22  unwarranted."  Cal. Corp. Code § 309.  However, an exception to

23  the business judgment rule exists "in 'circumstances which

24  inherently raise an inference of conflict of interest' and the

25  rule 'does not shield actions taken without reasonable inquiry,

26  with improper motives, or as a result of a conflict of

27  interest.'"  Berg & Berg Enterprises, LLC v. Boyle, 178

28  Cal.App.4th 1020, 1045 (2009)(citations omitted).

15

1   As the sole shareholder, sole director, and CEO of IDM, Mr.

2  Vowell owed a fiduciary duty to IDM.  Although Mr. Vowell

3  testified that he relied on the judgment of an accountant, the

4  business judgment rule does not protect him because there is a

5  conflict of interest in this case:  Mr. Vowell was a director of

6  both IDM and Sashi and the distribution went to him.  Further,

7  Mr. Vowell breached his fiduciary duty by obligating IDM to

8  transfer the money to buy the property, to pay rent it could not

9  afford, and to pay for tenant improvements.  This breach caused

10  damage to IDM because as Mr. Garcia testified, IDM could not

11  afford the lease, and when they moved into the West Oaks

12  Property, "that is when the wheels started to fall off."  See Mr.

13  Vowell Email Dated January 21, 2007, Ex. 104.  Accordingly, the

14  Court finds that Mr. Vowell breached his fiduciary duty and IDM

15  is entitled to damages.  However, the Court will not permit

16  double recovery of the $2,650,000.

17       D.   Tax Refunds

18   The Trustee claims that the $454,299 and $301,879 tax

19  refunds should be returned to the bankruptcy estate on an unjust

20  enrichment theory.  In addition, the Trustee claims that the tax

21  refunds breached Mr. Vowell's fiduciary duty and constitute

22  improper distributions.  Trustee's Proposed F&C ¶¶ 63, 64.  The

23  Court will not address these two claims because neither was

24  sufficiently addressed in the Trustee's proposed findings of fact

25  and conclusions of law or in his supplemental brief.

26   Tax refunds arising from pre-petition earnings or losses are

27  generally considered property of the bankruptcy estate under 11

28  U.S.C. § 541.  Segal v. Rochelle, 382 U.S. 375, 380-81 (1966)

(holding that a loss-carryback tax refund was property of the chapter 7 estate); In re Salazar, 465 B.R. 875, 881 (B.A.P. 9th Cir. 2012) ("Tax refunds are property of the bankruptcy estate under § 541(a).") (citing Segal v. Rochelle, 382 U.S. 375, 379 (1966); United States v. Sims (In re Feiler), 218 F.3d 948, 955–56 (9th Cir. 2000)).

Tax refunds that belong to the bankruptcy estate may be recovered based on an unjust enrichment theory. In re Forman Enterprises, Inc., 273 B.R. 408, 413 (Bankr. W.D. Pa. 2002) ("The [net operating losses] might be viewed as providing a substantial benefit *for defendants* which debtor conferred on them as a result of their own course of conduct and which would be unconscionable for them to retain.") (emphasis in original).  "When a defendant receives a benefit in circumstances such that it would be unwarranted to retain that benefit at the expense of another, the defendant is said to be unjustly enriched."  In re GSM Wireless, Inc., 2:12-BK-16456 RK, 2013 WL 4017123, at *45 (Bankr. C.D. Cal. Apr. 5, 2013).  "Under California law, the elements of unjust enrichment are: (1) the receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another."  Id.  In this case, Mr. Vowell used IDM's 2006 net operating losses to offset IDM's 2004 income (a "loss carryback"), which resulted in a $454,299 tax refund.  Similarly, IDM's 2005 income was offset by a loss carryback to receive a $301,879.00 tax refund.[2]  Both tax refunds were a result of pre-petition earnings and therefore,

---

[2] It is unclear which year's net operating losses were used, but this information is unnecessary to determine whether the refund belongs to the estate.

1   they belonged to the bankruptcy estate.

2      The Court must determine whether Mr. Vowell was unjustly

3   enriched by retaining the tax refunds.  Mr. Vowell received the

4   benefit of a $454,299 tax refund based on IDM's earnings and

5   losses.  However, Mr. Vowell did not retain the benefit at the

6   expense of IDM.  Based on Mr. Vowell's testimony, this tax refund

7   was used to pay creditors and restart IDM.  Therefore, Mr. Vowell

8   was not unjustly enriched.

9      Mr. Vowell also received the benefit of a $301,879.00 tax

10  refund based on IDM's earnings and losses.  Unlike the $454,299

11  tax refund, there is no evidence that this refund was used to pay

12  IDM's creditors or improve IDM.  The money went to Mr. Vowell

13  even though IDM was going through bankruptcy proceedings when he

14  received the tax refund in 2011.  Mr. Vowell, as a result, was

15  unjustly enriched at the expense of IDM.

16     Accordingly, the Court finds that Mr. Vowell must pay the

17  $301,879.00 tax refund to the bankruptcy estate, but is not

18  obligated to pay the $454,299 tax refund.

19     E.   Conversion and Conspiracy

20     The Trustee brought a conversion claim to recover the value

21  of IDM's good will and income stream.  He claims that Mr. Vowell

22  and Mr. Garcia are equally liable as co-conspirators for the

23  theft of the value of the assets on May 1, 2007.

24     Under California law, "[c]onversion is the wrongful exercise

25  of dominion over the property of another."  Ross v. U.S. Bank

26  Nat. Ass'n, 542 F. Supp. 2d 1014, 1023-24 (N.D. Cal. 2008)

27  (citation omitted).  "To establish conversion, a plaintiff must

28  show: (1) the plaintiff's ownership or right to possession to the

1  property at the time of conversion; (2) the defendant's

2  conversion by a wrongful act; and (3) damages."   Id.

3       IDM owned its good will and income stream, but there was no

4  conversion by a wrongful act in this case.  Mr. Garcia testified

5  that the there was no transfer from IDM to Fidelis because the

6  customer list and contracts were worthless.  However, his

7  testimony is contradicted by the emails in which both Mr. Vowell

8  and Mr. Garcia state they do not want to lose IDM's income

9  stream.  Mr. Garcia Email dated March 20, 2007, Ex. 32, at 2; Mr.

10  Vowell Email dated March 26, 2007, Ex. 110, at 1.  Moreover, Mr.

11  Vowell testified that IDM's assets were used to set up Fidelis,

12  he encouraged Fidelis' employees to call IDM's customers, and in

13  one email, he said, "I called him and told him IDM is not dead

14  just reorganizing or something like that."  Mr. Vowell Email

15  Dated May 4, 2007, Ex. 108.  Fidelis also used IDM's documents in

16  particular the employee confidentiality agreement.  Mr. Vowell's

17  Testimony; Lawrence Lemus Email, Ex. 27.  Therefore, the Court

18  finds that Mr. Vowell and Mr. Garcia set up Fidelis to continue

19  IDM's business by finishing IDM's contracts and using its

20  customer list, and Fidelis was initially set up using IDM's

21  assets.  As a result, on May 1, 2007, IDM granted Fidelis a right

22  to possess IDM's good will, income stream, and assets until the

23  plan fell apart (i.e., IDM transferred to Fidelis its good will,

24  income stream, and assets).  The transfer, however, was

25  voluntary.  A voluntary transfer is not a wrongful act as

26  required to establish a conversion claim.  In re Lau Capital

27  Funding, Inc., 321 B.R. 287, 304 (Bankr. C.D. Cal. 2005) ("A

28  transfer that is voluntary is not wrongful because a voluntary

1   transfer is consensual and thus, is not wrongful.")  In addition,

2   after the plan fell apart, there is no evidence of conversion

3   because Fidelis moved out and it purchased its own furniture,

4   computers, servers, software, and customer list.  See Ex. 13b.

5       Accordingly, the Court finds that the Trustee's conversion

6   claim fails thereby making it unnecessary for the Court to

7   address the Trustee's conspiracy claim.

8       F.   Fraudulent Transfer

9       The Trustee also seeks to avoid and recover IDM's good will

10  and income stream as a fraudulent transfer under federal

11  bankruptcy law and state law.  Unlike the fraudulent transfer

12  claim for the $2,650,000 transfer, the Trustee argues that both

13  types of fraudulent conveyances, actual and constructive, apply

14  in this instance.  See Trustee's Supp. PTB at 7.

15          1.   Actual Fraudulent Conveyances

16      Pursuant to 11 U.S.C. § 548(a), the Trustee may avoid any

17  transfer that was made or incurred within 2 years if the transfer

18  was made with actual intent to hinder, delay, or defraud

19  creditors.  11 U.S.C. § 548(a).

20      The transfer of IDM's good will and income stream to Fidelis

21  occurred in 2007, within two years of the filing of the

22  bankruptcy petition.  From the emails and testimony, Fidelis was

23  created with the understanding that it would benefit from IDM's

24  connections and income stream while being distinguished from IDM

25  to prevent IDM's creditors from going after it.  See Garcia Email

26  Dated March 20, 2007, Ex. 32, at 2 ("This would keep creditors

27  from saying its [sic] just IDM south"); Garcia Email, Ex. 110, at

28  2 ("U installed this thought that[]future biz cant be IDM or that

creditors could come after you" and "[h]ow do we insure that you are protected from IDM's creditors on this new venture?").  Mr. Vowell testified that they intended to reach out to creditors and they paid the creditors they could, but Mr. Vowell and Mr. Garcia's plan was never communicated to the creditors.

Mr. Garcia argues that although there were discussions about Mr. Vowell receiving a consulting fee and using IDM's assets, there was never an agreement and the Agreement for Consulting Services was never finalized.  See Agreement for Consulting, Ex. 55.  However, while a formal agreement was never signed, the emails and testimony show that Mr. Garcia and Mr. Vowell acted pursuant to a plan to create a company that did not have IDM's debt.  The plan fell apart, but by that point, they had executed the transfer.

Therefore, the Court finds that Mr. Vowell and Mr. Garcia created Fidelis and transferred IDM's assets to hinder creditors.

## 2.   Constructive Fraudulent Conveyance

As discussed above, to prove a claim for constructive fraudulent conveyance under 11 U.S.C. § 548(a)(1)(B), a plaintiff must show that (1) the transfer involved property of the debtor; (2) the transfer was made within two years of the filing of the bankruptcy petition; (3) the debtor did not receive reasonably equivalent value in exchange for the property transferred; and (4)(a) the debtor was insolvent at the time of the transfer or was made insolvent by the transfer or (b) the transfer was to an insider under an employment contract and not in the ordinary course of business.  11 U.S.C. § 548(a)(1)(B); see also In re United Energy Corp., 944 F.2d 589, 594 (9th Cir. 1991) (stating

1   elements of a claim for fraudulent transfer under § 548).

2          In this case, all the elements of a constructive fraudulent

3   conveyance are met:  The good will and income stream belonged to

4   IDM and the transfer occurred within two years of the filing of

5   the bankruptcy petition.  IDM did not receive a reasonable

6   equivalent value because none of the expected compensation under

7   the agreement was paid to IDM.  Mr. Vowell received some money

8   from Fidelis but there is no evidence it was returned to IDM.

9   Finally, it is undisputed that in 2007, IDM was insolvent.

10         Accordingly, the Court finds that the transfer to Fidelis

11  was an actual and a constructive fraudulent conveyance under the

12  Bankruptcy Code.  As a result, the transfer is also an actual and

13  a constructive fraudulent conveyance under state law.  See Screen

14  Capital Int'l Corp. v. Library Asset Acquisition Co., Ltd., 510

15  B.R. 248, 257 (C.D. Cal. 2014) ("The federal fraudulent transfer

16  provisions are 'similar in form and substance' to California's

17  fraudulent conveyance statutes . . . .") (citation omitted).

18              3.   Value of IDM

19       The Court must determine the value of IDM at the time of the

20  transfer.  The burden of proving the value of the goods is on the

21  trustee.  Kidder Skis Int'l v. Williams, 60 B.R. 808, 811 (W.D.

22  Mo. 1985).

23         In this case, the Trustee's expert estimated that IDM's

24  value at the time it was transferred to Fidelis on May 1, 2007,

25  was between $3,600,000 and $4,500,000, and Fidelis adjusted

26  profit for the first 8 months was $776,380.  Based on these

27  numbers, the Trustee proposes that the Court split the difference

28  between the lowest valuation provided by the expert ($3,600,000)

1    and Fidelis' adjusted profit ($776,380) to set IDM's value at

2    $2,188,190.  However, there was conflicting testimony at trial

3    about IDM's "customer list" and the expert failed to itemize the

4    intangible assets he considered in his valuation of IDM.

5    Additionally, Mr. Garcia testified that he received nothing from

6    IDM, IDM had abandoned its contracts thus rendering the contracts

7    worthless, and business generated by Fidelis was the sole result

8    of new business with dealers after May 1, 2007.

9        The Court did not find Mr. Garcia's testimony credible

10   because as mentioned above, several of his emails suggest that

11   IDM had a valuable income stream.  In addition, the Court gives

12   little to no weight to the expert's testimony regarding IDM's

13   value because there were several deficiencies in his appraisal

14   methodology.  In re 3dfx Interactive, Inc., 389 B.R. 842, 868

15   (Bankr. N.D. Cal. 2008) ("The court may decline to accept an

16   expert's opinion, in whole or in part, and may reject an expert's

17   opinion based upon its conclusions regarding the expert's

18   credibility. . . .  Even uncontradicted expert testimony is not

19   necessarily conclusive.")

20       As a result, the Trustee failed to meet his burden of

21   proving the value of the IDM's goodwill and income stream.  Even

22   though the Court finds there was a transfer and it is avoidable,

23   there is no valuation evidence on which the Court can reach the

24   conclusions urged by the Trustee.  Accordingly, the Court cannot

25   award judgment for the value of IDM.

26       G.   Successor Liability

27       In the alternative, the Trustee argues that successor

28   liability is an appropriate remedy based on the fraud-to-

23

1   creditors theory.

2       Under successor liability, "a corporation purchasing the

3   principal assets of another corporation assumes the other's

4   liabilities" only if "(1) there is an express or implied

5   agreement of assumption, (2) the transaction amounts to a

6   consolidation or merger of the two corporations, (3) the

7   purchasing corporation is a mere continuation of the seller, or

8   (4) the transfer of assets to the purchaser is for the fraudulent

9   purpose of escaping liability for the seller's debts." Maloney

10  v. Am. Pharm. Co., 207 Cal. App. 3d 282, 287 (1988) (quoting Ray

11  v. Alad Corp., 19 Cal.3d 22, 28 (1977)).  Although successor

12  liability often refers to purchases, liability may extend to

13  asset transfers as well. See Stoumbos v. Kilimnik, 988 F.2d 949,

14  961 (9th Cir. 1993) (stating that successor liability can extend

15  to "transfers other than straightforward purchases")

16  (interpreting Washington law similar to California law).  When

17  "actual fraud or the rights of creditors are involved, . . . the

18  courts uniformly hold the new corporation liable for the debts of

19  the former corporation." Cleveland v. Johnson, 209 Cal.App.4th

20  1315, 1327 (2012)(emphasis in original), review denied (Jan. 23,

21  2013).

22      In this case, the evidence shows that Fidelis was created

23  with the understanding that it would benefit from IDM's

24  connections and income stream while being distinguished from IDM

25  to prevent IDM's creditors from going after it.  Therefore, the

26  transfer of IDM's assets to Fidelis was for the fraudulent

27  purpose of escaping liability for IDM's debt.  However, the

28  agreement fell through after a few weeks and Fidelis broke all

1   ties to IDM.  None of the parties address whether the lack of a

2   continuing tie is sufficient to negate successor liability.

3   Because successor liability is an equitable principle, "it is

4   appropriate to examine successor liability issues on their own

5   unique facts and [c]onsiderations of fairness and equity apply."

6   Cleveland, 209 Cal.App.4th at 1330 (internal quotations and

7   citations omitted).  Under these circumstances, it would be

8   inequitable to allow Fidelis to escape liability by severing its

9   ties with IDM after it received benefits from IDM and after many

10  creditors were defrauded.  Otherwise, companies could avoid

11  successor liability by restructuring the form of the transfer and

12  severing all ties after a short period.

13       Accordingly, the Court finds that Fidelis is IDM's

14  successor.  The Trustee also seems to suggest that Mr. Garcia

15  should be held directly liable (see Trustee's Proposed F&C

16  ¶¶ 121-123), but he fails to address alter ego liability.

17

18                 III.   CONCLUSIONS OF LAW

19       1.   The $2,650,000 transfer was not a fraudulent transfer

20  under the Bankruptcy Code or California law.

21       2.   IDM is the alter ego of Sashi.

22       3.   The $2,650,000 transfer was an improper distribution,

23  but the Vowells are entitled to a $575,000 offset.

24       4.   Mr. Vowell breached his fiduciary duty by transferring

25  the $2,650,000.

26       5.   Mr. Vowell was unjustly enriched by the $301,879.00 tax

27  refund, but not the $454,299 tax refund.

28       6.   Fidelis, Mr. Garcia, and Mr. Vowell did not convert

1   IDM's assets because the transfer was voluntary.

2         7.   The transfer of IDM's good will and income stream was

3   an actual and a constructive fraudulent transfer under the

4   Bankruptcy Code and California law; however, the Trustee failed

5   to meet his burden of proving the value of the IDM's goodwill and

6   income stream.

7         8.   Fidelis is the successor of IDM because Fidelis was

8   created for the purpose of avoiding liability.

9

10                      IV.   ORDER

11        For the reasons set forth above, the Court orders that

12  judgment be entered against Mr. Todd Vowell and in favor of the

13  bankruptcy estate in the amount of $2,376,879.00. The Court

14  further orders that declaratory judgment be entered against

15  Fidelis declaring it liable for IDM's debt on Plaintiff's

16  successor liability claim. Finally, the Court orders that

17  judgment be entered in favor of Raeanne Vowell and Jeffrey

18  Garcia.

19        IT IS SO ORDERED.

20  Dated: September 18, 2014

21                                          _____

22                                          JOHN A. MENDEZ,
                                            UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

                              26